162130, J.P. Morgan Chase Manhattan Bank v. Larry Winget, et al. Arguments not suitable for 1625, Mr. Andy, for the appellate. Good morning Judge Gibbons, Judge Rogers, Judge Dunlap. I will reserve three minutes for rebuttal. I'm John Anding and I represent the appellants in this case. I would like, if I could, first of all, to just give you a brief outline of what this case is about and some backdrop as well as the three issues before the court. This is an appeal of the district court's award of $11 million in attorney's fees, actually in excess of $11 million. First, the backdrop. This guarantee was one of 21 guarantees that were executed in connection with a rather complex loan restructuring with Chase Manhattan Bank. Of those 21 guarantees, only one was non-recourse, the guarantee of my clients. Non-recourse means this was not an ordinary guarantee. It means further that this meant that Mr. Winget, my client, while he was liable for a deficiency in connection with any judgment that might be entered against the underlying debtor of the company, his obligation was only $50 million. So while liability here was $425 million, his obligation was $50 million. Now that's important for two reasons. First reason is that obligations and liability with respect to Mr. Winget are not the same as those terms are used in the court's opinion below. The second reason it's important is that the non-recourse guarantee by its nature was written to limit Mr. Winget's exposure to Chase, unlike the other guarantors in this case. The three issues, I think, can be placed into three buckets. The first issue is the $2 million which the district court ordered Mr. Winget to pay in connection with legal fees that were incurred in two prior cases that had been resolved by final judgment and appealed to this court and affirmed six years earlier. The district court rejected Mr. Winget's res judicata defense to those six-year-old fees, saying that there was a waiver in a loan provision, basically a boilerplate waiver, and that waiver waived his right to assert res judicata. Yeah. You're not suggesting that we read that out of the agreement because it was boilerplate because the parties agreed to the entire contract. Well, Judge, I'm not suggesting anything. I'm suggesting that such a boilerplate waiver is not supported under Michigan law. It's effective to waive res judicata. In fact, the district court cites not a single case, nor does Chase, because there is none. This is a diversity case. Cases showing that such boilerplate was disregarded? There are no Michigan cases that address the issue of what the effect of boilerplate in a loan provision is. We're just back to Judge Dunn's question of what we do with the boilerplate. Well, here's what we should do. We should follow the existing Michigan Supreme Court case, Dart v. Dart, which we cite to the court, which makes very clear that Michigan applies a very broad definition to res judicata. The Michigan Supreme Court has indicated very clearly that res judicata is to be enforced, and that's the rule that should be followed here. The second bucket or issue here is the $7 million that the district court ordered Mr. Winchett to pay for legal fees that were incurred by Chase, not improving his obligations under the guarantee, but the trust's obligations under the guarantee, another guarantor. The district court rejected Mr. Winchett's objection that he should only be responsible for those fees related to proving his obligation because the court found, well, because the liability for the trust had to be established, and that same liability was the liability of Mr. Winchett, Mr. Winchett's responsible for the legal fees paid and showing the liability of the trust. But here's the problem. Mr. Winchett didn't dispute liability below. There were no legal fees incurred in connection with that issue with respect to Mr. Winchett. The third bucket is the $11 million, and this is the $11 million that Mr. Winchett actually paid to Chase in which the court below refused to credit towards satisfaction of the legal fees that had been awarded. The district court held that Section 10 of the guarantee did not require Chase to apply the $50 million first to pay the legal fees despite the fact that the word first appears in Section 10. The court ruled instead, well, that provision wasn't really a promise to Mr. Winchett. It was a promise among the lenders, except this is a guarantee. This is not an intercreditor agreement. This is not an interlender agreement. It's not a syndication agreement. And there are no lenders other than Chase who is a party to the guarantee. So I'd like to start, if I could, by going back just for a moment to the race-judicata issue, which is the $2 million. With respect to that issue, Michigan law applies in this diversity case, and Michigan law provides that legal fees are damages. They must be sought in the litigation in which is being litigated. The 2005 and 2006 litigations were concluded without Chase ever making a claim for damages. Michigan law also applies with respect to race-judicata, and as I pointed out, it has adopted a very broad view of race-judicata, and there is not a single Michigan case that suggests the Michigan Supreme Court would adopt the position the district court adopted, which is that a boilerplate loan provision waives race-judicata. While this is not a Michigan case, I think it's apt in terms of guidance to this court in deciding the issue in this case. This is the U.S. Supreme Court and federated department stores talking about the application of the doctrine of race-judicata. We have stressed that the doctrine of race-judicata is not a mere matter of practice or procedure inherited from a more technical time than ours. It is a rule of fundamental and substantial justice, of public policy, and of private peace, and it should be cordially regarded and enforced by the courts, and that's exactly what we asked this court to do, to enforce the law of the state of Michigan as it is today. The second issue, which I mentioned, is the issue regarding the apportionment of fees based on the actual amounts expended in connection with proving the obligations of Mr. Winget and the trust under the guarantee. Nothing in the provision that the court relied on to award attorneys' fees makes Mr. Winget responsible for the obligations of the trust. Nothing in the provision that the court relied upon allows the court to assess fees against Mr. Winget that were incurred in proving somebody else's obligation. But that's exactly what the court did here, and I might point out that Section 17 and the provision of the judgment that the court relied upon to award these fees both support our position. Here's what they say. The guarantors agreed to pay all costs and expenses incurred by Chase in endeavoring to collect the guarantee from Winget and the trust with respect to their obligation. In this particular case, we have a non-recourse guarantee. The obligation of Mr. Winget is $50 million, and only then, with respect to pledged stock, Chase spent a little over a million dollars proving that. Chase spent $7 million proving that the trust had an unlimited obligation with unlimited recourse, and they spent three and a half years doing it while Mr. Winget stood on the sideline. And yet now Mr. Winget is being asked to pay those legal fees. That's not what Section 17 provides. It's not what logic suggests is an appropriate result. In fact, it's not even intuitive. The court, as I said, substituted the word liability for obligations when it applied Section 17, but the word liability does not appear in Section 17, only the word obligations. And as I said, it's both intuitive and logical that this court should remand to the district court to apportion the legal fees that were expended in proving these distinct and separate obligations, which this court found were separate and distinct in its 2015 opinion in this case. Finally... We did that under specific language, though, right? You did it in connection with Section 3 of the agreement. It referred to one of the two parties rather than the guarantors totally, right? It did refer to one of the two parties. Yes, that's true. That's not the case with respect to the provision that the $12 million was awarded under. It is, in fact, the same. Because the pronoun... It uses one name and not the other name. No, it does not use one name and not the other. It talks about the guarantor, which this court, in its 2015 opinion at page 256, said was intended by the parties to not be treated interchangeably. That's the holding of this court, that they are not interchangeable, even when the word guarantor is used. I might point out that we argued to this court... Can I follow that? It's because it's in the singular and not the plural that makes all the difference here? You'd have to ask Judge Griffin. But Judge Griffin concluded that because the word guarantor was used... I thought it was because the word winget was used. Well, we argued to the court that because there are 19 references to the guarantor in singular throughout the guarantee, including pronouns of his and he, that this was intended to be a guarantee that treated both the same. This court rejected that and said, no, when it refers to guarantor, we're not talking about referring to a single person. We're talking about referring to the two of them, and they were not to be treated interchangeably under this guarantee. And that's true of Section 17 as well. So the court talked about the obligations under the guarantee being separate... Okay. They were separate and distinct. But there's language in there that talks about holding people jointly and severally liable. So why should winget be held separate and distinct from the trust with respect to the guarantee obligations where the language is jointly and severally? Well, that's a very good question, Judge, and let me see if I can answer that. First of all, that's what the judgment provides. The judgment provides that fees are to be assessed based on the respective obligations of the guarantors. That's what the judgment says, and that's what the court utilized to award fees here. Specifically, winget and the trust are liable to Chase for expenses incurred by Chase in endeavoring to collect the guaranteed obligations from winget and the trust with respect to their obligations. Well, their obligations are not the same. With respect to the joint and several liability point, Chase raises for the first time that I appeal, didn't raise it below, that Section 18 provides for joint and several liability. But if you look at Section 18, Section 18 is drawing a line of distinction between joint and several liability of the guarantors under this guarantee and the other 20 guarantors. So in other words, with respect to enforcement of this, to the extent that there is responsibility as between winget and the trust, the guarantors here under, and the other 20 guarantors, it will be joint and several liability. Again, that was an argument raised for the first time on appeal, and we don't believe it was even preserved. Thank you. Good morning, Your Honors.  I'm Kendra Stead on behalf of J.P. Morgan Chase. Your Honors, I'd like to start with two things that my opponent said that I'd like to draw out. One, my opponent mentioned Mr. Winget didn't dispute liability below. That is not, in fact, the case. In Mr. Winget's answer to our complaint, and this is at Record Entry 41, their affirmative defense, Paragraph 7, argued that plaintiff's action is barred under the terms of the guarantee due to its failure to satisfy all conditions precedent. That was an answer filed by both Mr. Winget and the trust. They were contesting liability under the guarantee. If you look at their counterclaims, Paragraph 35, Vermin Act 1, one of their counterclaims requested a ruling that Chase has, quote, Chase has no rights against Winget or the trust under the guarantee until it has complied with the reasonable efforts and last resort conditions of the pledge agreements. Again, both Mr. Winget and the trust were contesting liability below. Another point I wanted to bring out is that my opponent described Mr. Winget's obligation as limited to $50 million. That is a description of Chase's recourse against Mr. Winget for the underlying debt. It is not a description of Mr. Winget's obligations under the guarantee. Mr. Winget was liable under Section 17 of the guarantee, as was the trust, for the full extent of Chase's costs and expenses of collection. Mr. Winget and the trust raised the argument below before the district court prior to this court's prior ruling, prior to the February 2015 opinion, that that $50 million payment in January 2014 wiped out all obligations under the guarantee. That's, in fact, not correct. That was rejected by this court in the prior appeals. That's settled law. So to state that the guarantee is non-recourse against Mr. Winget, first of all, that's not true. We did have recourse up to $50 million. Secondly, that has nothing to do with Section 17 or the obligation for fees. That's been settled. It's been settled by the district court. It's been settled by this court. The attempt to relitigate that now is improper. And the basis for seeking to relitigate it is also improper. Mr. Winget and the trust are arguing that their liability should be apportioned under the guarantee, that if Chase spent a fee seeking enforcement against Mr. Winget versus if Chase incurred a fee seeking enforcement against the trust, you need to split that out, that Chase needs to go after the trust part of that and needs to go after Mr. Winget for the other part. They based that argument on this court's prior ruling in February 2015 about Section 3 of the guarantee. But they're flipping that ruling on its head because what was under Section 3 was a specific reference to Mr. Winget individually. The fact that Section 3's language looked different than the rest of the guarantee, the fact that Section 3 did not rely on the collective definition of guarantor. In fact, that's a... Do you rely on that distinction? I'm sorry? Do you rely on that distinction in our opinion? Relied on that distinction to reverse the district court's... Was it actually naming Mr. Winget versus not naming Mr. Winget? Yes. The panel noted that in Section 3, Winget is named separately and individually. It further noted, right after the sentence that my opponent cites, it said the parties did not agree to treat Winget and the trust as one and the same, the very next sentence of the opinion went on to state, rather the plain text of Section 3 names Winget and only Winget as having limited exposure. So it's the fact that Section 3's language looked different that led to the reversal of the reformation decision. That decision doesn't... It wouldn't follow to say that where the collective definition is used, where guarantor is not called out separately, or where the collective definition is used and where no individual guarantor is named, as in the case in Section 17, that Mr. Winget and the trust should be treated differently. I'd like to take just a moment to talk about why defendants are seeking an apportionment despite the plain language of Section 17. As my opponent mentioned, much of the 2008 action involved litigating defendants' counterclaim for reformation. That was aimed at limiting Chase's recourse against the trust for the guaranteed obligations. Now defendants argue that to the extent a fee award was incurred, or that a fee was incurred in resisting the reformation claim, Chase can look only to the trust to collect. But Mr. Winget purports to have revoked the trust in early 2014. So he asserts that because there's no trust, there's no way to collect a judgment against the trust. So if a portion of the fee award were allocated only against the trust, defendants would argue that's uncollectible, or at best it's collectible if Chase prevails on a fraudulent conveyance claim below. The contract doesn't allow for that kind of gamesmanship, and it doesn't compel the apportionment the defendants now seek. The district court's ruling that both Mr. Winget and the trust are liable for all fees and expenses should be affirmed. Now I'd like to discuss the res judicata issue in the 2005 and the 2006 actions. Defendants argue that because Chase did not file fee petitions in those actions, Chase is barred by res judicata from seeking the expenses it incurred in those actions. Now that argument was waived in the contract, as defendants have acknowledged. It also ignores that defendants' liability for fees wasn't actually established until the 2008 action. That means the time you could seek fees was when you had a ruling that defendants were liable for fees. So the district court correctly recognized that defendants contractually waived any res judicata argument. That's plain from Section 17, which states that no failure delayed by the administrative agent or any partial exercise of the administrative agent's rights constitutes a discharge of Winget's obligations. But that's exactly what defendants are arguing here. They're saying that Chase partially exercised its rights in the 2005 action, but then didn't go and seek fees. It's only seeking fees now. But that's exactly the type of argument that Section 13 is designed to foreclose, and it's not the only section of the guarantee that does that. Section 4, Romanet 7, does the same thing. So does Section 5. All of those contract provisions make clear that defendants contractually forfeited any argument that Chase was barred from obtaining the fees from the 2005 and 2006 actions. Moreover, Chase brought the fee petition at the first point that it could. Chase's entitlement to fees was not established until the 2008 action. That's when the district court ruled that Winget and the trust were liable for all of Chase's costs under Section 17 of the guarantee. Until that point, as I pointed out reading defendants' counterclaims and affirmative defenses, whether Chase had any rights whatsoever under the guarantee was vigorously litigated up until that point. In fact, it was litigated before this panel in the cross appeals. I hope you'll save some time for the satisfaction issue. I shall. I'd like to read one part to you from the decision in the cross appeals, and then I'm happy to move on to the Section 10 issue. This isn't the first time that defendants have raised a res judicata argument against Chase. When Chase sought to enforce against Mr. Winget and Mr. Winget resisted that collection, defendants then argued that Chase was barred by res judicata from seeking it because Chase had not done so in the 2005 action. So this is not a new argument either. This court in the 2015 opinion rejected that argument, noting that even assuming there's an identity of facts creating the right of action, the current case, the 2008 action, required entirely different evidence from Winget 1. The present case required evidence about how much Winget owed, whether the guarantees were enforceable as a legal matter, and whether certain assets had been disposed of. And that's reflected in the final judgment from which these appeals are taken. The final judgment awarded Chase its fees in this action, related actions, and future actions. This action meant the 2008 case. Related actions meant the 2005 and 2006 cases. Judge Rogers, I'd like to address any questions you have about Section 10 of the guarantee. Now defendants are arguing that the district court erred by not holding that Winget had already satisfied the fee award by paying Chase $50 million in January 2014. So essentially they're saying that that $50 million payment to release the pledges preemptively satisfied an $11 million fee award that wouldn't be entered until some time later. Now defendants have argued several times, including once to this court, that Winget's payment of $50 million meant Chase was not entitled to any recovery for fees or expenses. Therefore, there's no question that the district court properly rejected that argument as already litigated. But that ruling is also correct on the merits. Section 10 has no relevance whatsoever to defendant's obligations under Section 17. Section 10 is an application of payments provision. It describes how money received by Chase will be distributed among the various lenders, and it informs the guarantors how interest will run against them. It does not provide, as guarantors would have it, as defendants would have it, that a $50 million payment can wipe out $61 million of obligations. Is that document, is it meant in any way to provide any type of notice or reliance on behalf of folks like Mr. Winget? I think the notice is that Mr. Winget and defendants will understand that as interest is occurring on the principal, any delay in payment of the principal will run against them, as opposed to that risk being borne by the lenders, because Chase is going to apply payments first to payments if it's a cost of collection internally, before applying that to the principal. So in addition to it being a document to be relied upon by the lenders, it is, I mean, there is a purpose that it serves. There is a reason it is in this agreement. It is to notify the guarantors of how interest will run as to them. So they need to know that the risk of delay, the delay of payment is going to run against the guarantors and not as against Chase. And in fact, the contrary reading of Section 17, the reading that says if you pay $50 million, you can prepay $11 million of fees. I believe they're arguing you can prepay $50 million of fees and expenses. That would wipe Section 17 out of the contract. If that were how Section 10 had to be read, what that would mean is the more roadblocks defendants threw up, the more they fight, the less Chase would recover. That is contrary to the basic fundamental rule of contract interpretation that you have to read contracts as a whole, and you can't read them as small pieces divorced from the entire contract, and that's exactly what defendants are proposing. The District Court's ruling on Defendant Section 10 argument should likewise be affirmed. If the panel has no further questions, I'll yield the remainder of my time. Judge Dunnell, I'd like to start with your question regarding the purpose of Section 10. The purpose of Section 10 is to provide Mr. Widget with non-recourse protection. Here's the first recital, one of the first recitals in the guarantee, which appears at the record at 530-3. Actually, I want to make sure that that's correct. I believe it's actually 487-1. No, it is 487-1. It appears on the very first page of the guarantee. There it recites the following. It is the condition precedent to the agent and lenders of the Eighth Amendment that the guarantor execute and deliver this guarantee, whereby the guarantor shall guarantee the guaranteed obligations on a non-recourse basis. Now, why do I emphasize that? A non-recourse basis means to limit the guarantor's exposure to the bank. Mr. Widget negotiated limitations that included Section 10, which said that the first dollars that are paid are going to retire attorney's fees. Why would that be important to him? Because under Section 3, he only had a $50 million liability as to the principal. To the extent that there were attorney's fees that were incurred, he wanted to make sure those attorney's fees were retired first so that he wasn't stuck with additional liability under Section 17. What Chase purports to do is rewrite the agreement. This was an agreement that was intended to protect Mr. Widget with non-recourse protection, and Section 10 should be applied as written. It is very clear. As this court said in 2015, unambiguous contracts in Michigan must be enforced as written. Mr. Widget paid $50 million, and the first $11 million was obligated to retire those attorney's fees. Pure and simple. It may not be fair, but Mr. Widget didn't think it was fair either when Section 3 was interpreted to impose unlimited liability on his trust when not a single bank representative testified they'd ever heard mention of the trust or ever required an unlimited liability from the trust. But this court said, a contract's a contract. We need to enforce the language. And that's what we're asking you to do here. Enforce the language as written. Now, as to liability and obligations in terms of the allocation, once again, Chase conflates liability with obligations. And it did so in its briefing, which the court heavily borrowed from in its opinion. The fact of the matter is, we opposed Chase's position that we were obligated to pay $50 million. That's all we opposed. The $425 million or the deficiency was irrelevant to Mr. Widget and was not litigated below and was not disputed below. And that's just a fact. Your time is up. Thank you very much. We appreciate the argument both of you have given, and we will consider the case carefully.